**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

HARTFORD FIRE INSURANCE
COMPANY,

      Plaintiff-Counter-
      Defendant-Appellee,

v.

P & H CATTLE COMPANY, INC.;
EMPORIA LIVESTOCK SALES,
INC.; OLMA V. PEAK; VELMA M.
PEAK; AMBY SCOTT PEAK;
VIRGINIA L. MORRIS;
CHRYSANNE M. HASELHORST,
Trustees of the Olma V. Peak and
Velma M. Peak Irrevocable Trust;
OLMA V. PEAK AND VELMA M.
PEAK IRREVOCABLE TRUST,

      Defendants-Counter-
      Claimants-Appellants,

   and

TIM REECE, doing business as
Reece Cattle Company,

      Defendant-Cross-
      Defendant.

No. 07-3010
(D.C. No. 05-CV-2001-DJW)
451 F. Supp. 2d 1262 (D. Kan. 2006)

**ORDER AND JUDGMENT**[*]

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

(continued...)

Before **PORFILIO**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

Appellants P & H Cattle Company, Inc.; Emporia Livestock Sales, Inc.; Olma V. Peak; Velma M. Peak; the Olma V. Peak and Velma M. Peak Irrevocable Trust; and Amby Scott Peak, Virginia L. Morris, and Chrysanne M. Haselhorst, Trustees, (collectively the Peaks), appeal the district court's grant of summary judgment in favor of Hartford Fire Insurance Company on its contractual indemnity claim. We have jurisdiction under 28 U.S.C. § 1291[1] and we affirm.

Pursuant to the Packers and Stockyards Act, 1921, 7 U.S.C. § 204, Hartford issued a bond listing itself as surety and P & H Cattle as the principal (P & H Bond). P & H Cattle, Emporia Livestock Sales, Olma Peak, and Velma Peak (collectively Indemnitors) subsequently executed a General Indemnity Agreement (GIA) with Hartford. Hartford defended and ultimately settled a claim under the P & H Bond by Aaron Wilkie (Wilkie Claim) for $75,000. Hartford then filed this action seeking indemnification under the GIA for the settlement amount and

---

[*](...continued)
ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]     In a separate order the district court certified its award of summary judgment in favor of Hartford on its contractual indemnity claim as a final judgment under Fed. R. Civ. P. 54(b).

its attorney's fees and costs expended in defending and settling the Wilkie Claim, as well as its attorney's fees and costs in bringing this action. The district court granted Hartford summary judgment on its contractual indemnity claim against the Indemnitors and awarded Hartford its requested relief.

In this appeal, the Peaks raise three claims of error: (1) the district court lacked jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy did not exceed $75,000; (2) Hartford's losses in defending and settling the Wilkie Claim are not recoverable under the terms of the GIA; and (3) Hartford cannot recover attorney's fees or costs under the GIA. The facts, as they relate to these claims on appeal, are not disputed and are set forth in detail in the district court's decision. *See Hartford Fire Ins. Co. v. P & H Cattle Co.*, 451 F. Supp. 2d 1262, 1265-71 (D. Kan. 2006). We will not repeat them here, except as they relate to the arguments raised by the Peaks.

### Standards of Review

The Peaks initially claim that the district court did not have subject-matter jurisdiction under § 1332. "The ultimate question of whether diversity jurisdiction exists is a mixed question of law and fact to be reviewed *de novo*, with any factual findings of the district court reviewed for clear error." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1105 (10th Cir. 2005). The Peaks' remaining two claims of error address the district court's grant of summary judgment in favor of Hartford. "We review the district court's grant of

summary judgment *de novo*, applying the same legal standard used by the district court. We also review the district court's interpretation of [a contract] *de novo*." *Old Republic Ins. Co. v. Durango Air Serv., Inc.*, 283 F.3d 1222, 1225 (10th Cir. 2002) (citation omitted). And we review de novo the district court's interpretation of Kansas law. *See Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1536 (10th Cir. 1995).

### *Diversity Jurisdiction*

In its complaint, Hartford alleged federal court jurisdiction existed under § 1332. Where there is diversity of citizenship of the parties, § 1332(a) gives district courts original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." Hartford's complaint sought a total sum in excess of $117,000, including the $75,000 settlement amount on the Wilkie Claim, plus attorney's fees, costs, and interest. Nonetheless, the Peaks argue that, under Kansas law, attorney's fees and costs are not recoverable under the GIA, and without the additional sums for attorney's fees, costs and interest, the amount in controversy was only $75,000. Therefore, they assert that the district court should have dismissed Hartford's claim for lack of subject-matter jurisdiction.

This argument ignores altogether the district court's basis for concluding there was jurisdiction under § 1332. The court summarized the "legal certainty rule" for determining whether the amount-in-controversy requirement is satisfied:

"Under the legal certainty rule, pleading damages in excess of the amount in controversy requirement in the complaint is sufficient to satisfy the jurisdictional requirement unless it appears to a legal certainty that the plaintiff in good faith cannot claim that amount." *Hartford Fire Ins.*, 451 F. Supp. 2d at 1272 (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)). Rather than addressing application of the legal certainty rule, the Peaks instead argue the merits of their contention that Kansas law precludes recovery of attorney's fees and costs under the GIA. Their argument aptly illustrates the lack of legal certainty regarding that very question. We conclude that the district court correctly determined that Hartford's prayer for judgment in an amount exceeding $75,000 was sufficient to meet the jurisdictional requirement under § 1332(a).

### *Interpretation of the GIA*

The Peaks contend that the terms of the GIA do not provide for indemnification of the loss sustained by Hartford in defending and settling the Wilkie Claim because none of the Indemnitors were involved in the underlying transaction that gave rise to that claim. Some background is necessary to understand this argument. As described by the district court, the specifics of the Wilkey transaction were as follows:

> On February 14, 2001, Aaron Wilkey d/b/a A & W Cattle Company ("Wilkey") sold 225 head of fat cattle for $186,780.39, which were shipped from the Hy-plains Feedyard to Iowa Beef Processors in Emporia, Kansas for slaughter. The cattle were ultimately purchased by Holmes Livestock, who issued a check in the

amount of $186,780 payable to Tim Reece. Upon receiving the check from Holmes Livestock, Tim Reece's wife endorsed the check and sent it to Wilkey's bank. The check was dishonored for payment due to insufficient funds.

*Hartford Fire Ins.*, 451 F. Supp. 2d at 1267. After failing to receive payment for his cattle, Wilkey made a claim under the P & H Bond, which listed "Tim Reece DBA Reece Cattle Company" as an "other registrant[]" and "CLEAREE." *See* Aplee. Supp. App. at 89, 95.[2] Hartford denied the claim and Wilkey then filed an action against P & H Cattle, as principal, and Hartford, as surety, to recover on the P & H Bond.

Hartford initially resisted the Wilkey Claim on the basis that P & H Cattle did not act as a clearing agency under Clause 3 in the Wilkey transaction. But Hartford ultimately concluded there was a substantial risk that it and P & H Cattle could be held liable on the P & H Bond, even though P & H Cattle was not aware

---

[2]    "Other registrants" could be added to Clause 3 of the P & H Bond by rider. Clause 3 provided that the bond was "applicable" and "remain[ed] in full force and virtue"

> [i]f the said Principal, acting as a clearing agency responsible for the financial obligations of other registrants engage[d] in buying livestock, . . . or if such other registrants, shall [fail to] (1) pay when due to the person or persons entitled thereto the purchase price of all livestock purchased by such other registrants for their own account or for the accounts of others [or] (2) safely keep and properly disburse all funds coming into the hands of such Principal or such other registrants for the purpose o[f] paying for livestock purchased for the accounts of others.

Aplee. Supp. App. at 89.

of and did not participate in the transaction with Wilkey. Hartford settled the Wilkey Claim for $75,000. It then filed this action against the Peaks, seeking recovery under the GIA of the settlement amount and its costs and attorney's fees expended in defending the Wilkey Claim.

The Indemnitors filed a counterclaim against Hartford, asserting that Hartford was negligent in settling the Wilkey Claim. Further, in response to Hartford's summary judgment motion, the Indemnitors contended they were not liable under the GIA because the Wilkey Claim was not a valid claim on the P & H Bond. But the district court concluded that Hartford was not required to show that the bond claim was valid in order to enforce the GIA. *Hartford Fire Ins.*, 451 F. Supp. 2d at 1281-82. It held that Hartford need only show that it acted reasonably in settling the Wilkey Claim, and it concluded that Hartford had demonstrated its conduct was reasonable. *Id.* at 1279. The court also granted summary judgment in Hartford's favor on the Indemnitors' negligence counterclaim. *Id.* at 1285–86.

On appeal, the Peaks do not identify any error in the district court's ruling that Hartford acted reasonably in settling the Wilkey Claim. Nor have they appealed the district court's dismissal of the Indemnitors' negligence claim against Hartford. But they argue that Hartford cannot recover *under the GIA* because none of the Indemnitors was aware of or participated in the transaction with Wilkey. They rest their argument on Section II of the agreement, which

provides, in relevant part: "This Agreement applies to all Bonds executed by the Surety (1) on which any Indemnitor either acts solely or as a member of a partnership or a joint venture, or (2) in connection with which any Indemnitor acts as a silent partner or a silent joint venturer." Aplee. Supp. App. at 100. Before ruling on Hartford's summary judgment motion, the district court asked the parties for additional briefing on whether this section limits or qualifies the GIA's applicability to "all Bonds" executed by Hartford. Focusing solely on the underlying transaction with Wilkey, the Peaks argued that the GIA does not provide indemnification for the Wilkey Claim because none of the Indemnitors acted solely in that transaction, or acted in that transaction as a partner or joint venturer, silent or otherwise, with Tim Reese. The Peaks quoted the language of Section II and asserted that its plain meaning is clear. But they provided no basis for reasonably interpreting it in the manner that they propounded.

Hartford disagreed with the Peaks' interpretation, contending that Section II does not address the Indemnitors' activity, or lack thereof, in any underlying transaction. Hartford argued that it could recover under the GIA for sums it expended in connection with the Wilkey Claim because P & H Cattle acted solely in procuring the P & H Bond from Hartford. Therefore, Hartford contended that the P & H Bond falls within the application of the GIA because, under Section II, the agreement applies not only to Bonds issued at the request of an Indemnitor acting solely, but also when they request Bonds as a member of a partnership or

-8-

joint venture. Thus, Hartford argued that Section II not only does not limit the Indemnitors' liability under the GIA, but actually *expands* the definition of which Bonds are covered. Hartford contended that its construction of Section II is consistent with the four corners of the GIA, addressing various other provisions of the agreement.

The district court considered the meaning of the word "acts" in Section II, noting the parties' differing interpretations and the consequence of each with regard to whether Hartford could recover on its claim. *Hartford Fire Ins.*, 451 F. Supp. 2d at 1277. The court construed "'acts' to mean the indemnitor's acts of procuring a bond from the surety" and illustrated why its interpretation was consistent with other provisions of the GIA. *Id.* at 1277-78. Then, concluding that it could reasonably infer that one of the Indemnitors acted to procure the P & H Bond on behalf of P & H Cattle, it held that the GIA applied to that bond. *Id.* at 1278.

### Strict Construction Against the Drafter

The Peaks first argue that the district court erred in failing to strictly construe the GIA against Hartford, as the drafter, because the GIA is both an indemnity agreement and an adhesion contract. They contend that under this rule of construction the district court had no option but to select the Peaks' interpretation of the GIA. We disagree. The rule requiring construction against the drafter does not come into play unless and until a court reaches the conclusion

that an agreement is ambiguous. *See Mo. Pac. R.R. v. City of Topeka*, 518 P.2d 372, 376 (Kan. 1974) ("Doubts arising from ambiguity or obscurity in the language used [in the indemnity agreement] are to be resolved against the party preparing the contract."); *St. Francis Hosp. & Sch. of Nursing, Inc. v. Eckman*, 510 P.2d 175, 177 (Kan. 1973) (noting rule of construction applicable to adhesion contracts applies only after finding vagueness or uncertainty in contract's meaning).

The Peaks do not argue that the GIA is ambiguous; indeed, they contend that the language of Section II is clear. But they assert that the district court concluded the GIA is ambiguous. We find no such holding in the district court's decision. And we note that it confined its analysis to the four corners of the GIA, as is appropriate in construing an unambiguous agreement. *See Hartford Fire Ins.*, 451 F. Supp. 2d at 1277-78; *see also Clark v. Wallace County Co-Op. Equity Exch.*, 986 P.2d 391, 393 (Kan. Ct. App. 1999) (holding court must interpret unambiguous contract within its four corners). Moreover, the court's acknowledgment of the parties' differing interpretations does not constitute a finding that the GIA is ambiguous. *See Allied Mut. Ins. Co. v. Moeder*, 48 P.3d 1, 4 (Kan. Ct. App. 2002) ("The fact that the parties do not agree over the meaning of the terms does not in and of itself prove that the contract is ambiguous."). Thus, in the absence of a holding that the GIA is ambiguous, we conclude that the

-10-

district court did not err in failing to construe the agreement strictly against the drafter.

### *Construction of Unambiguous Terms*

The Peaks argue in the alternative that the district court erred in construing the unambiguous terms of the GIA. We review the district court's interpretation of the agreement de novo. *See Old Republic Ins. Co.*, 283 F.3d at 1225. The parties agree that the GIA should be construed under Kansas law. In *Missouri Pacific Railroad*, the Kansas Supreme Court made "a few observations as to indemnity":

> The word is generally defined as an obligation resting on a party to make good any loss another has incurred while acting at his request or for his benefit; it is a right which inures to a person who has fulfilled an obligation owed by him but which as between himself and another person should have been discharged by the other. In construing a contract of indemnity and determining the rights and liabilities of the parties thereunder, the important question to be determined is the intention of the parties, and effect should be given to that intention if such can be done consistently with legal principles.

518 P.2d at 375-76 (citation omitted). Furthermore, "[r]easonable rather than unreasonable interpretations of contracts are favored." *Kan. State Bank & Trust Co. v. DeLorean*, 640 P.2d 343, 349 (Kan. Ct. App. 1982). And a court must construe each section in the context of and consistent with the entire agreement, rather than critically analyzing a single provision. *See Zukel v. Great W. Managers, LLC*, 78 P.3d 480, 484 (Kan. Ct. App. 2003). A court's "job is to use

-11-

common sense and not to strain to create an ambiguity in a written instrument when one does not exist." *Allied Mut. Ins. Co.*, 48 P.3d at 4.

In this case, the district court looked first at the language of the initial paragraph of the GIA. *See Hartford Fire Ins.*, 451 F. Supp. 2d at 1277. It provides:

> One or more of the undersigned, herein called Indemnitors, has requested or may request Hartford Fire Insurance Company or any of its insurance company affiliates, herein individually and collectively called Surety, to furnish, procure or continue contracts of suretyship, guaranty or indemnity, or other obligatory instruments, herein called Bonds, on behalf of any one or more of the Indemnitors.

Aplee. Supp. App. at 100. This language broadly defines the term "Bonds," which is used throughout the GIA, to include numerous different types of instruments. Further, such Bonds may be requested by any Indemnitor "on behalf of any one or more of the Indemnitors." The district court also considered the second paragraph of the GIA. *See Hartford Fire Ins.*, 451 F. Supp. 2d at 1277-78. That paragraph provides:

> By the execution of this Agreement, the Indemnitors expressly warrant their material or beneficial interest in such Bonds, and in consideration of the furnishing, procuring or continuing of such Bonds, and other good and valuable consideration, the Indemnitors hereby jointly and severally agree to the following[.]

Aplee. Supp. App at 100. This provision indicates that Hartford's "furnishing, procuring or continuing of such Bonds" is the consideration for the agreements made by the Indemnitors in the GIA. One such agreement is in Section III:

-12-

> The Indemnitors will indemnify and hold the Surety harmless from all loss, liability, damages and expenses including, but not limited to, court costs, interest and attorney's fees, **which the Surety incurs or sustains (1) because of having furnished any Bond**. . . ."

*Id.* (emphasis added). This provision broadly defines the scope of the Indemnitors' liability to extend to all losses Hartford incurs "because of having furnished any Bond."

As the district court observed, *see Harford Fire Ins.*, 451 F. Supp. 2d at 1278, other references in the GIA support the conclusion that it is intended to cover all Bonds executed by Hartford, at the request of and on behalf of one or more of the Indemnitors. For example, Section XV states, "This is a continuous Agreement which remains in full force and effect as to every Bond issued by the Surety." Aplee. Supp. App. at 101. Section XIV requires the Indemnitors to immediately provide Hartford with written notice of any demand or action "relating to any Bond." *Id.* at 100. That section provides further that Hartford "may adjust, settle or compromise any claim, demand, suit or judgment upon any Bonds." *Id.* at 101.

We note as well that the GIA includes plainly-stated references to underlying transactions, including provisions regarding actions by the Indemnitors and others with respect to those transactions. Section I refers to "Bonds required in connection with the performance of a contract." *Id.* at 100. Section VI refers to "the status and condition of work under any contracts being

-13-

performed by any Indemnitor and the financial status of such contracts." *Id.* Section VII likewise refers to "[a]n Indemnitor's abandonment, forfeiture or breach of, or failure, refusal or inability to perform, a contract guaranteed by any Bond." *Id.* And Section X provides that the Indemnitors waive notice of "[d]efaults under contracts or any acts which might result either in claims, or in liabilities of the Surety under any Bonds." *Id.*

Finally, we observe that the other provision in Section II of the GIA expands, rather than limits, the Indemnitors' liability. It provides that, "[i]f [Hartford] procures the execution of Bonds by other sureties, or executes Bonds with cosureties, the provisions of this Agreement shall inure to the benefit of such other sureties or cosureties as their interests may appear." *Id.*

Against this background, we consider what it means to "act" "on" or "in connection with" a "Bond," as those words are used in Section II. According to the Peaks, acting on or in connection with a Bond refers to the Indemnitors' actions in an underlying transaction that results in a claim under the Bond. Therefore, under their construction, the GIA would only sometimes apply to the P & H Bond, depending on whether an Indemnitor participates in the underlying transaction that gives rise to a claim under that bond. P & H Cattle made essentially the same argument in defending the Wilkey Claim, by asserting that the P & H Bond did not cover the Wilkey Claim because P & H Cattle did not participate in the Wilkey transaction. But, after determining there was a good

-14-

chance that defense would not succeed, Hartford settled the Wilkey Claim. The district court ruled in this action that Hartford acted reasonably in doing so. *Hartford Fire Ins.*, 451 F. Supp. 2d at 1279. As we have indicated, the Peaks did not appeal that ruling. Nonetheless, they seek to extend their argument regarding lack of participation in the underlying transaction to the construction of the scope of their liability to indemnify Hartford under the GIA.

The Peaks' proposed interpretation improperly looks at Section II in isolation, rather than in harmony with the rest of the agreement. *See Zukel*, 78 P.2d at 484. As we have noted, they failed to analyze in the district court why their interpretation is reasonable and consistent with the other terms of the GIA. Nor do they make any effort to do so on appeal. They also provide no explanation why Hartford would accept liability as surety under a Bond requested by and for the benefit of one or more Indemnitors, yet limit its ability to obtain indemnification from the Indemnitors under the GIA for claims on that Bond that it reasonably settles.

We conclude that the GIA applies to all Bonds executed by Hartford at the request of one or more of the Indemnitors, whether an Indemnitor acts alone, or as a member, silent or otherwise, of a partnership or joint venture, in making a request to Hartford to furnish, procure, or continue a Bond. The Indemnitors agreed under the GIA to make good the losses Hartford incurred because of having furnished a Bond at their request. Therefore, this interpretation of Section

II is also consistent with the general meaning of indemnity as "an obligation resting on a party to make good any loss another has incurred while acting at his request or for his benefit." *Mo. Pac. RR.*, 518 P.2d at 375. We conclude that it is the only *reasonable* interpretation.

### *Recovery of Attorney's Fees and Costs Under the GIA*

The Peaks' third and final claim of error is that the district court wrongly concluded that Hartford could recover attorney's fees and costs under the GIA. Section III of the agreement provides for that recovery:

> The Indemnitors will indemnify and hold the Surety harmless from all loss, liability, damages and expenses **including, but not limited to, court costs**, interest **and attorney's fees**, which the Surety incurs or sustains (1) because of having furnished any Bond, or (2) because of the failure of an Indemnitor to discharge any obligations under the Agreement, or (3) in enforcing any of the provisions of this Agreement.

Aplee. Supp. App. at 100 (emphasis added). The district court held that Hartford was entitled to recover its attorney's fees and costs incurred in defending and settling the Wilkey Claim and in enforcing the GIA in this action. *Hartford Fire Ins.*, 451 F. Supp. 2d at 1286. But the Peaks contend that the provision for recovery of attorney's fees and costs in the GIA is null and void under a prior version of Kan. Stat. Ann. § 58-2312. At the time the GIA was executed in 1993, § 58-2312 provided in relevant part (emphasis added):

> Hereafter it shall be unlawful for any person or persons, company, corporation or bank, to contract for the payment of attorney's fees **in any note, bill of exchange, bond or mortgage**; and any such contract or stipulation for the payment of attorney's fees shall be null

-16-

and void; and that hereafter no court in this state shall render any judgment, order or decree by which any attorney's fees shall be allowed or charged to the maker **of any promissory note, bill of exchange, bond, mortgage, or other evidence of indebtedness** by way of fees, expenses, costs or otherwise. . . ."[3]

The question is whether the previous version of this statute applied to indemnity agreements. The district court concluded it did not, relying on the reasoning in *In re Dvorak*, 176 B.R. 929 (Bankr. D. Kan. 1994). *See Hartford Fire Ins.*, 451 F. Supp. 2d at 1283-84. In *Dvorak* the court distinguished indemnity agreements from the agreements listed in § 58-2312. *See* 176 B.R. at 934. Similar to this case, the indemnitee in *Dvorak* was the surety on a bond for which the indemnitor was the principal. The court held that the bond and the indemnity agreement were distinct and the indemnity agreement could not be "characterized as a bond." *Id.* It also reasoned that an indemnity agreement is not a "note" because it is not "an unconditional promise to pay a fixed amount of money." *Id.* And it concluded that an indemnity agreement is not "an evidence of indebtedness" because, "[a]t the time the indemnity agreement is entered into, there is no debt." *Id.*

We have found no Kansas authority directly on point and therefore we must predict how Kansas courts would decide the question whether the former version

---

[3]     The statute was amended in 1994, deleting this language and adding new language permitting provisions in credit agreements for the recovery of certain costs of collection, but the amended version has not been applied retroactively. *See Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 678-80 (Kan. Ct. App. 1996).

of § 58-2312 applied to indemnity agreements. *See United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004) ("If the state supreme court has not interpreted a provision of the state's statutory code, the federal court must predict how the court would interpret the code in light of state appellate court opinions, decisions from other jurisdictions, statutes, and treatises." (quotation and brackets omitted)). The Peaks point to *In re Woerner*, 19 B.R. 708, 712 (Bankr. D. Kan. 1982), which held that § 58-2312 applied to indemnity agreements. The *Woerner* court concluded, without rationale, that "a promise by the principal to indemnify the surety at the time the surety pays monies to the principal's creditor" was "clearly" a promissory note or evidence of indebtedness. *Id.* We find the reasoning in *Dvorak* more persuasive on that point.

They also argue that § 58-2312 precludes Hartford's recovery of attorney's fees and costs because the loss Hartford seeks to recover for is based upon a bond. Hartford counters that the attorney fee provision it sought to enforce is in the GIA, rather than the P & H Bond. We agree with Hartford that § 58-2312 nullified provisions for the payment of attorney's fees and costs "in" bonds, but did not broadly prohibit the recovery of attorney's fees and costs otherwise related to bond claims. *Cf. Wingrove v. People's Nat'l Bank*, 275 P. 150, 150-51 (Kan. 1929) (upholding jury verdict awarding attorney's fees under settlement agreement related to mortgage foreclosure, despite prohibition in § 58-2312).

Finally, the Peaks argue that the prior version of § 58-2312 applied to the GIA because it is a surety or guaranty agreement, rather than an indemnity agreement. We agree that § 58-2312 applied to surety and guaranty agreements. *See Iola State Bank v. Biggs*, 662 P.2d 563, 575 (Kan. 1983) (concluding obligations of sureties and guarantors are substantively the same and holding that guaranty agreement involving unconditional promise to pay sum certain upon default of principal fell within terms of § 58-2312). But we disagree that the GIA is a surety or guaranty agreement. The Kansas Supreme court described a surety or guaranty relationship as "a contractual relation resulting from an agreement whereby one person, the surety [or guarantor], engages to be answerable for the debt, default, or miscarriage of another, the principal." *Id.* at 574 (quotation omitted). Moreover, a surety's or guarantor's "obligation to the creditor or promisee of the principal is said to be direct, primary, and absolute; in other words, he is directly and equally bound with his principal." *Id.* at 575 (quotation omitted). Although the Peaks point out that neither Olma Peak nor Velma Peak signed bond agreements with Hartford, they do not explain why that fact makes the GIA a guaranty or surety agreement. It shows only that there is no principal and surety relationship between them and Hartford in a separate bond agreement. And they identify no sense in which Olma Peak or Velma Peak stand in the role of surety or guarantor of a principal's obligations under the GIA.

-19-

As noted by the Kansas Supreme Court in *Iola State Bank*, indemnity agreements are distinguishable from surety and guaranty agreements because "[a]n indemnitor agrees to make whole the indemnitee who in turn had to pay the obligee." *Id.*; *see also Mo. Pac. R.R.*, 518 P.2d at 375 ("[Indemnity] is generally defined as an obligation resting on a party to make good any loss another has incurred while acting at his request or for his benefit.") The GIA is clearly an indemnification agreement. Furthermore, although the Kansas Supreme Court did not directly hold in *Iola State Bank* that the previous version § 58-2312 was inapplicable to indemnity agreements, the fact that it expressly distinguished them from surety and guaranty agreements in that precise context leads us to conclude that it would so hold. Therefore, we reject the Peaks' claim that the district court erred in awarding Hartford its attorney's fees and costs under the GIA.

### *Conclusion*

The judgment of the district court is AFFIRMED.

Entered for the Court

Stephen H. Anderson
Circuit Judge

-20-